**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  | : |  |
| --- | --- | --- |
| QUR'AN GOODMAN, | : | Civil Action No. 16-4591 (JMV) |
|  | : |  |
| Petitioner, | : |  |
|  | : |  |
| v. | : | **OPINION** |
|  | : |  |
| PATRICK NOGAN, *et al.*, | : |  |
|  | : |  |
| Respondents. | : |  |
|  | : |  |

**APPEARANCES:**

Qur'an Goodman
East Jersey State Prison
Lock Bag R
Rahway, NJ 07065
            Petitioner, *pro se*

Lucille M. Rosano
Assistant Prosecutor
Essex County Prosecutor's Office
50 West Market Street
Newark, NJ 07102
            On behalf of Respondents.

**Vazquez, United States District Judge**

## I.      INTRODUCTION

Petitioner Qur'an Goodman ("Petitioner"), a prisoner currently confined at East Jersey State Prison in Rahway, New Jersey, has filed a *pro se* Petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  (ECF No. 7).  For the reasons explained in this Opinion, the Court will deny the Petition and will deny a certificate of appealability.

## II.      FACTUAL BACKGROUND & PROCEDURAL HISTORY

The factual background and procedural history in this matter were summarized in part by the New Jersey Superior Court, Appellate Division upon Petitioner's direct appeal.[1]

> Goodman, whose street name was "Blak," was a member of the "Crips" gang. Prior to the events that gave rise to this case, he and [Rashon] Bryant had a longstanding friendship. Goodman regularly spent time at the corner located at the intersection of Ellis Avenue and Hopkins Place in Irvington. And, at various times, Bryant sold drugs at the same corner.
>
> Goodman and other Crips members attempted without success to convince Bryant to become a Crip. In 2000, when Bryant was sentenced to state prison, he was not a member of any gang. However, according to Tauheedah Carney, his girlfriend from 1999 until his death in 2004, Bryant became a member of the "Bloods" gang while incarcerated. Carney described the Crips and Bloods as rival gangs, each of which used certain colors and language as gang symbols.
>
> Carney described the corner frequented by Goodman and Bryant as Crips territory. She related that, in 1999, when she was occasionally dropped off at the corner by Bloods members, Goodman would ask "[w]hy [she] was letting them slob n**gers drop [her] off [t]here." Goodman even objected to her wearing brown scarves because brown was a Bloods color.
>
> According to Carney, she remained Bryant's girlfriend during his incarceration, writing to him while he was in prison. After almost four and a half years of incarceration, Bryant was transferred to a halfway house in March 2004. Carney visited Bryant every week while he was at the halfway house.
>
> On one occasion in 2004, Carney told Goodman that Bryant had asked about him. According to Carney, Goodman seemed angry and responded "that he don't want to talk to [Bryant] because [Bryant] turned to the other side on him."

---

[1] The facts found by the Appellate Division are presumed correct pursuant to 28 U.S.C. § 2254(e)(1).

Bryant was released from the halfway house on June 28, 2004. On the night of July 4, 2004, Carney agreed to go with Bryant to the corner of Ellis Avenue and Hopkins Place at 11:00 p.m., where Bryant intended to see Goodman. Bryant asked her to bring a gun to him at the corner, but did not explain why. Bryant left for the corner early and did not pick Carney up, so Carney had a friend drop her off.

When Carney arrived at the corner, she observed that an argument was taking place nearby, but she could not discern the participants. She called out to Bryant, who walked over to her with a man she had seen once before but did not know by name. Goodman approached them from another direction and gave Carney a hug. According to Carney, she witnessed no argument between Goodman and Bryant and there was no sign that Goodman possessed a weapon at that time. After hugging Carney, Goodman

> walked up to . . . the porch [of a nearby house], talked to some girl for a minute. Then he left the porch, went around the house, came back around the house. He stood in front of us. He asked the guy that was with [Bryant] for some cigarettes. The boy say he was gonna save him something, that's when he shot [Bryant].

Carney related that she was standing not more than two feet away from Bryant when he was shot.

Carney heard three shots, began to run away, and then heard more shots. When she turned around, she saw Goodman running from the corner towards Springfield Avenue. The unidentified man was sitting on a nearby curb crying, but was gone by the time the police arrived. Carney returned to Bryant, but he appeared to be dead. He was subsequently pronounced dead at the scene.

Angela Smith and a friend were also at the corner of Ellis Avenue and Hopkins Place on the evening of the shooting, having purchased cocaine from Bryant. Smith observed that a crowd was gathered at the corner, and she saw Bryant and Goodman at the corner with a woman she did not know. Bryant and Goodman were having an argument. She heard someone say, "Go ahead, do what you gotta do," and saw Goodman walk out of sight. Smith then observed Goodman return, walk up to Bryant, and shoot him four or five times.

When the police and an ambulance arrived, Carney told the police officers that she was Bryant's girlfriend, but gave them a false name and told them that she did not see who had shot Bryant. She testified that she did so because she did not want people in the crowd to know her name or that she was supplying information to the police. Later, at the Irvington police station, Carney told Detective Harold Wallace what she had seen and identified Goodman as the person who shot Bryant. She eventually gave the police a complete statement.

Goodman was indicted in November 2004. In May 2005, Goodman and his cousin, Naim Jones, were both incarcerated at the Essex County Jail. Jones, who was known as "Murda," was a Bloods member, and had fathered a daughter with Carney's best friend. On May 11, 2005, during a search following a disturbance at the jail, Sergeant John Ferrante of the Essex County Department of Corrections found a letter written by Goodman in Jones's cell. The letter, as subsequently redacted for the jury, stated:

> 4/18/05 Murda, what's hood? Yeah, this is ya lil cousin. Yo, I'm writing you because I just got indicted in court today and I truly need you to reach out to those mean streets and do your numbers. I'm sending you one page of my paperwork, I hope this is enough. If not, let me know. I was just in court with your dude Uzikas and he knew a lot about me and we was talkin on some real street shit about ol'girl, and he told me that y'all can't move off of word of mouth and that y'all needed some paperwork. So, here's the paperwork. Murda, I really need you. You are my only hope, so get back to me and let me know something a'ight? Your lil cousin forever. Blak. P.S., let me know if you got the paperwork. I sent it with the letter. Okay.

A copy of the first page of Carney's statement, with her identifying information and address, was attached to the letter. Jones's girlfriend told Carney about the letter at some point thereafter.

Carney was incarcerated in the Essex County Jail at the time of Goodman's trial. On August 22, 2006, while she was in a holding cell in anticipation of testifying at the trial, she saw Goodman being transferred within the jail. According to Carney, Goodman "walked up to the [holding cell] and said is I'm gonna testify against him and I asked him why he do that? He say, he could had done something to me, and I ain't never say nothing back to him. I just looked at

him." She believed Goodman meant that he would have had "somebody do something" to her if he had known she was going to testify against him.

Goodman's jury trial started on August 29, 2006. Goodman sought to bar the introduction of any evidence related to gang membership, including expert testimony, arguing that it was irrelevant and unduly prejudicial. Judge John C. Kennedy held a Rule 104 hearing. After noting that there were no New Jersey cases specifically allowing the utilization of such evidence to demonstrate motive, the judge concluded that the proposed evidence satisfied the requirements of N.J.R.E. 404(b) and *State v. Cofield*, 127 N.J. 328, 604 A.2d 230 (1992) ("[E]ven if the other-crime evidence is relevant to prove some legitimate trial issue, the trial court must exclude it unless . . . its probative value outweighs its prejudicial impact."). He also cited case law from other jurisdictions that "generally agreed" that evidence showing that a defendant and victim were members of different gangs would be admissible for the purpose of showing motive.

The judge found that

> [g]ang evidence is admissible, despite the prejudice that attaches, if it is relevant and particularly if it is crucial in establishing motive. And the State, in my view has cobbled together sufficient facts to warrant submitting to the jury this evidence on the issue of motive. And it's not a decision whether or not I would find that it clearly or convincingly establishes motive beyond a reasonable doubt. I don't think that that's a decision that I can come to. But I can say that a juror- a reasonable juror could find it clear and convincing, and a reasonable juror could come to a conclusion beyond a reasonable doubt that there is evidence of motive in this case. So, I'm going to allow the evidence to come in.

> As I indicated, the facts as testified by Miss Carney, in my view were very simple and straightforward. Number two, there was evidence that these folks were both members of rival gangs. Three, the site of the shooting was a Crip corner. Four, that the defendant- that the victim was a Blood on a Crip corner. And five, that the defendant in this case had expressed distress and/or anger over the fact that the victim had become a member of the Bloods.

So I'm going to allow the State to introduce into evidence that issue and I will give a limiting instruction to the jury at the same time that the State indicates that it's going to introduce this evidence. And I guess I should really be dealing with that maybe in my initial instructions, because I guess that both counsel are going to want to address that in their opening statements, so I'm going to have to say something about it during the course of my initial instructions to the jury.

Counsel agreed upon the following language, which the judge used during jury selection.

During the trial, you'll hear references to an allegation that the decedent and defendant were members of rival street gangs. It would be up to you to determine if that is true or not true and whether, if true, that has any relevance to a possible motive for the charges set forth in the indictment. I can tell you, however, that you can never use that evidence to conclude that defendant has a predisposition to commit any crimes or that simply because you find he was a member of a gang, he must be guilty of the crimes charged in the indictment, I'll tell you more about that later. Is there anyone here who believes that such evidence alone would make it difficult for you to be a fair and impartial juror?

In addition, the judge gave the following preliminary charge to the impaneled jury at the start of the trial.

Now, when we were selecting the jury in this case, I told you that during the course of the trial you will hear references to an allegation that the decedent, Rashon Bryant, and the defendant were members of rival street gangs. It will be up to you to determine if that is true or not true, and whether if it is true, that it has any relevance to a possible motive for the charges set forth in the indictment. I can tell you, however, that you can never use that evidence to conclude that the defendant has a predisposition to commit any crimes, or that simply because you find he was a member of a gang, or that the victim may have been a member of a gang . . . the defendant,

therefore, must be guilty of the crimes charged in the indictment.

In his final jury charge, after explaining the specific use for which the gang related evidence was admitted, the judge continued:

> Whether this evidence does, in fact, demonstrate motive is for you to decide. You may decide that the evidence does not demonstrate motive and is not helpful to you at all. In that case, you must disregard it.

> On the other hand, you may decide that the evidence does demonstrate motive and you may utilize it for that specific purpose. However, you may not use this evidence to decide that the defendant has a tendency to commit crimes or that he is a bad person. That is, you may not decide that just because the defendant is a member of a street gang, or that the decedent was a member of a street gang, the defendant must be guilty of the present crimes. I have admitted this evidence only to help you decide the specific question of motive. You may not consider it for any other purpose and may not find the defendant guilty now simply because the State has offered evidence that he . . . was a member of a street gang.

Goodman also sought to bar testimony about Goodman's letter to Jones and his statement to Carney at the Essex County Jail. The trial judge held Rule 104 hearings on those issues. He determined that there was sufficient credible evidence and allowed the testimony, citing *State v. Rechtschaffer*, 70 N.J. 395, 360 A.2d 362 (1976) ("Declarations subsequent to the commission of the crime which indicate consciousness of guilt, or are inconsistent with innocence or tend to establish intent are relevant and admissible.").

The judge also allowed introduction of Goodman's letter to Jones, once redacted to eliminate parts of the letter he found unduly prejudicial. Citing *State v. Buhl*, 269 N.J. Super. 344, 635 A.2d 562 (App. Div.), *certif. denied*, 135 N.J. 468, 640 A.2d 850 (1994), and *State v. Johnson*, 216 N.J. Super. 588, 524 A.2d 826 (App. Div. 1987), the judge found that the letter was relevant to consciousness of guilt and determined that the prejudicial effect could be addressed by a limiting instruction.

He gave the following limiting instruction to the jury.

[T]here is for your consideration in this case a letter allegedly written by the defendant to Naim Jones. The State contends that this letter was written by defendant and constituted an effort by him to enlist the help of Mr. Jones to either harm or intimidate [Carney], an alleged witness to the shooting of Rashon Bryant. The questions of whether the defendant wrote the letter and if he did, whether he intended it to be an effort to enlist someone to harm or intimidate [Carney] are also questions of fact for your determination.

If you find that the defendant wrote the letter and intended it to be an effort to enlist someone to harm or threaten [Carney], then you may consider it in connection with all the other evidence in the case as an indication of proof of consciousness of guilt on the part of the defendant. On the other hand, defendant claims that reasonably read, the letter does not seek to enlist anyone to harm or intimidate the witness. If you find the defendant did not write the letter and/or that it was not intended to seek help in harming or intimidating the witness in this case, you should disregard the letter entirely.

In addition to the fact witnesses mentioned above, the State presented additional fact and expert witnesses at the trial. Dr. Eddy Lilavois, an expert in forensic pathology, testified that Bryant's cause of death was multiple gunshot wounds, of which he found seven. Christopher Cosgrove, an investigator with the Essex County Prosecutor's Office, testified as a fact witness that shell casings and bullets were found at the scene, but that no guns were recovered. Lieutenant Dennis Hultay, Supervisor of the Essex County Sheriff's Office Ballistics Unit, testified that all recovered shell casings were fired from the same type of weapon.

Lieutenant Earl Graves, who worked for the Prosecutor's Office as Supervisor of the Essex County-Federal Gang Partnership, was qualified as an expert on street gangs and testified concerning Bloods and Crips gang culture and rivalry. Graves testified that three scars from cigarette burns located on Bryant's shoulder were intended to signify a dog paw, which is a symbol used to identify Bloods members.

Ferrante testified about the circumstances surrounding his discovery of the letter from Goodman in Jones's cell. He acknowledged that his May 13, 2005, report about his search of the cell did not mention the letter. He testified that he wrote a subsequent report, in December 2005, about the finding of the letter. He further testified that the letter remained in his custody until he gave it to the homicide squad at the Essex County Prosecutor's Office on May 25, 2005.

The State presented two expert witnesses on the authenticity of the letter, Delores Coniglio, of the New Jersey State Police Office of Forensic Sciences, and William Davis, a forensic document examiner from the New Jersey Division of Criminal Justice. Davis testified to his conclusion that Goodman had written the letter. Coniglio, an expert in forensic DNA analysis, testified that Goodman's DNA was present on the adhesive portion of the envelope that contained the letter.

Jones testified for the defense that he is Goodman's first cousin and that Carney's best friend, Ebony, is the mother of his child. He acknowledged that he received the letter from Goodman, but made no attempts at hiding or destroying it. Jones was asked by the State to display a tattoo on the back of his neck that read "187 CK." Graves had testified that "187" represented the California police code for homicide, and that "CK" stood for "Crip killer."

Davon Smith, who had known Carney since 2002, testified for the defense that he had been an inmate at the Essex County Jail and witnessed the confrontation between Carney and Goodman. According to Davon Smith, Goodman said: "Why is you doing this to me? I love you like a sister. I loved him like a brother. You know I did not do this, please don't do this to me." Officer Larry Bellome, who had been in the vicinity of the holding cell on that day, testified for the defense that he had not overheard any threatening conversation.

During her testimony, Angela Smith responded to a question about Goodman by stating that she knew him as "KB." She was asked whether she knew him by another name; and she responded: "Killa Blak." Defense counsel objected to the mention of the name "Killa Blak," and moved for a mistrial. After satisfying himself that the reference was inadvertent, the judge denied the motion. He gave the jury the following curative instruction:

I want now to give you an instruction. I am striking the testimony of Ms. Smith with regard to an alleged nickname of Quran Goodman. And I want you to disregard the testimony of Miss Smith

with regard to any alleged nickname of Quran Goodman, other than Blak. And I tell you right now that no nickname is evidence of guilt whatsoever.

> The use of a nickname, or any other kind of name, cannot and should not be considered by you for any purpose whatsoever, especially to show any predisposition on the part of defendant to commit a crime or to otherwise perform any bad act whatsoever. You must disregard that testimony with respect to any alleged nickname other than Blak. It is not evidence of anything and I am instructing you to disregard it. And in particular, and not without limitation, you are not to utilize any of that testimony whatsoever in any of your deliberation. It cannot be used by you.

> Now, I understand that it's hard for somebody to say: Don't think of a pink elephant And what I'm asking you to do, therefore, is while you might remember the testimony, I ask you to put it in a box. Put lines around it and you are not to utilize it for any purpose whatsoever in your . . . decision in this case.

> Mr. Goodman is presumed to be innocent and that presumption stays with him until the State had proven guilty beyond a reasonable doubt, if that is the conclusion that you come to at the end of this case. You cannot utilize this testimony in any way, shape, manner or form. If any of you feel that you're unable to abide by this instruction that I have now given to you, to disregard that testimony that I have now stricken, I need to know now. Is there anybody who feels that they can't abide by it? Anybody here feels that they would be unable to reach a fair and impartial verdict as consequence of hearing testimony that I've stricken and now have given you an instruction with respect to? All right.

> Let the record reflect that none of the jurors has responded affirmatively to that. And I'd like now for Miss Smith to be brought back into the courtroom and we will continue with our trial.

Goodman requested the judge to instruct the jury as to the lesser-included offenses of aggravated manslaughter and reckless

manslaughter. The State objected and the judge denied the request, citing *State v. Hammond*, 338 N.J. Super. 330, 768 A.2d 1069 (App. Div.), *certif. denied*, 169 N.J. 609, 782 A.2d 427 (2001). He explained that:

> [t]he evidence, including the eyewitness accounts of the event, rationally supports no finding other than that [Goodman] acted deliberately and intentionally in causing [Bryant's] death. And there are a plethora of other cases, *State v. Harris*, 141 N.J. 525 [662 A.2d 333] (1995), finding that no rational basis when the defendant fired a single shot into the victim's back and neck at close range.

> As the Court in that case noted, but what purpose did the gunshot have, other than to kill? In *State v. Biegenwald*, 126 N.J. 1 [594 A.2d 172] (1991), again the Court finding no rational basis for a lesser included charge when the defendant fired a sawed-off shotgun into the victim's abdomen at close range.

> Here, we have shots fired according to the witness at close range from a large caliber weapon, several of which were clustered in the chest and abdomen. I find no basis here, no rational basis to allow the jury to consider a charge of recklessness under circumstances manifesting extreme indifference to the value of human life, or plain reckless testimony. If they believe the witness's testimony, the charge here is murder. If they don't believe the witness's testimony in this case, well then that's the end of the case with respect to the charge of homicide.

*State v. Goodman*, 1 A.3d 767, **769-776 (N.J. Super. Ct. App. Div. 2010).

Following a jury trial, Petitioner was convicted of murder in violation of N.J. Stat. Ann. § 2C:11–3a(1) or (2); third-degree unlawful possession of a weapon (handgun) without a permit, in violation of N.J. Stat. Ann. § 2C:39–5(b) and second-degree possession of a weapon for an unlawful purpose, in violation of N.J. Stat. Ann. § 2C:39–5b; second-degree possession of a weapon (handgun) for an unlawful purpose, N.J. Stat. Ann. § 2C:39–4a. *See id.* at 769, 776. The trial judge merged the murder count and the second-degree possession of a weapon for an unlawful

purpose counts, and sentenced Petitioner to thirty years incarceration with parole ineligibility for the full term. *Id.* at 776. Petitioner was sentenced to a serve a concurrent four-year term for the third-degree unlawful possession of a weapon count. *Id.*

The Appellate Division affirmed Petitioner's conviction. *Goodman*, 1 A.3d 767 at 783. The New Jersey Supreme Court denied certification on January 7, 2011. *State v. Goodman*, 12 A.3d 210 (N.J. 2011).

Petitioner subsequently filed a petition for post-conviction relief ("PCR"), which the court denied on January 17, 2012, without convening an evidentiary hearing. (ECF No. 18-12). The PCR court denied the claims for varied reasons, *inter alia*, including procedurally barring under New Jersey Rule 3:22-4, Petitioner's ineffective assistance of trial counsel because of his failure to challenge a state witness as a gang expert and counsel's failure to "make a *Brady* application." (*Id.* at 31-33). On January 14, 2014, the Appellate Division reversed and remanded the PCR Court's decision to deny oral arguments, without making any judgment on the merits of Petitioner's claims. *State v. Goodman*, Indictment No. 04-11-3543, 2014 WL 113698 (N.J. Super. Ct. App. Div. Jan. 14, 2014).

On April 14, 2014, the PCR court convened a hearing on Petitioner's PCR petition, and heard oral arguments on Petitioner's ineffective assistance claims. (ECF No. 19-19). It subsequently denied Petitioner's PCR motion. (ECF No. 18-20 at 46). The Appellate Division subsequently affirmed the PCR Court's decision. *State v. Goodman*, A-448-13T2, 2015 WL 9947700 (N.J. Super. Ct. App. Div. Feb. 3, 2016). On May 19, 2016, the New Jersey Supreme Court denied Petitioner's petition for certification. *State v. Goodman*, 141 A.3d 296 (N.J. 2016).

Petitioner filed the instant petition for habeas relief under § 2254 on July 29, 2016, and an amended petition on November 23, 2016. (ECF Nos. 1, 7). On January 5, 2017, Respondents

filed a motion to dismiss arguing that Petitioner's filing was time barred, which the Court subsequently denied. (ECF Nos. 10, 14 ).

Petitioner raises the following claims in his federal habeas petition:

1. Petitioner's right to due process and a fair trial were violated as a result of the trial court's admission of a host of prejudicial evidence against Petitioner, including his gang membership, the alleged threats against Tauheedah Carney, evidence of his incarceration, and his nickname "Killa Blak." (ECF No. 7 at 20).

2. Petitioner was denied his right to effective assistance of counsel as a result of trial counsel's failure to challenge the trial court's ruling to allow the testimony of a gang witness. (ECF No. 7 at 25).

3. Petitioner was denied his right to effective assistance of counsel as a result of trial counsel's initial objection to a gang expert's testimony and subsequent waiver of that objection. (ECF No. 7 at 26).

4. Petitioner was denied his right to effective assistance of counsel as a result of trial counsel's failure to challenge the trial court's ruling that the jury could hear evidence of Petitioner's incarceration pending trial. (ECF No. 7 at 27).

5. Petitioner was denied his right to effective assistance of counsel as a result of trial counsel's failure to "make a *Brady* application." (ECF No. 7 at 28).

6. Petitioner was denied his right to effective assistance of counsel as a result of trial counsel's failure to retain an expert witness to rebut the state's gang expert witness's testimony. (ECF No. 7 at 28).

7. Petitioner was denied his right to effective assistance of counsel as a result of trial counsel's failure to challenge the trial court's decision to not provide an aggravated manslaughter jury instruction. (ECF No. 7 at 29-30).

8. Petitioner was denied his right to effective assistance of counsel as a result of the cumulative effect of counsel's errors. (ECF No. 7 at 30).

Respondents filed their Answer on August 30, 2017. (ECF No. 18).

## III.    STANDARD OF REVIEW

Section 2254(a) permits a court to entertain claims alleging that a person is in state custody "in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a). Petitioner has the burden of establishing each claim in the petition.  *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013).  Under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act, 28 U.S.C. § 2254 ("AEDPA"), federal courts in habeas corpus cases must give considerable deference to determinations of state trial and appellate courts.  *See Renico v. Lett,* 599 U.S. 766, 772 (2010).

Section 2254(d) sets the standard for granting or denying a writ of habeas corpus:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Where a state court adjudicated a petitioner's federal claim on the merits, a federal court "has no authority to issue the writ of habeas corpus unless the [state c]ourt's decision 'was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States,' or 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'"  *Parker v. Matthews*, 567 U.S. 37, 40-41 (2012) (quoting 28 U.S.C. § 2254(d)).  Moreover, AEDPA deference applies even

when there has been a summary denial.  *Cullen v. Pinholster*, 563 U.S. 170,  187 (2011) (citation omitted).

"[C]learly established law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of [the Supreme Court's] decisions," as of the time of the relevant state-court decision.  *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000))).  If a decision is "contrary to" a Supreme Court holding within 28 U.S.C. § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.  *Williams*, 529 U.S. at 413.  As to 28 U.S.C. § 2254(d)(1), a federal court must confine its examination to evidence in the record.  *Cullen*, 563 U.S. at 180-81.

Where a petitioner seeks habeas relief, pursuant to § 2254(d)(2), on the basis of an erroneous factual determination of the state court, two provisions of AEDPA necessarily apply. First, AEDPA provides that "a determination of a factual issue made by a State court shall be presumed to be correct [and] [t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *see Miller-El v. Dretke*, 545 U.S. 231, 240 (2005).  Second, AEDPA precludes habeas relief unless the adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).

In addition to the above requirements, a federal court may not grant a writ of habeas corpus under § 2254 unless the petitioner has "exhausted the remedies available in the court of the State." 28 U.S.C. 2254(b)(1)(A).  To do so, a petitioner must "fairly present all federal claims to the highest state court before bringing them in a federal court."  *Leyva v. Williams*, 504 F.3d 357, 365

(3d. Cir. 2007) (citing *Stevens v. Delaware Corr. Ctr.*, 295 F.3d 361, 369 (3d Cir. 2002)).  This requirement ensures that state courts "have 'an initial opportunity to pass upon and correct alleged violations of prisoners' federal rights.'"  *Id.* (citing *United States v. Bendolph*, 409 F.3d 155, 173 (3d Cir. 2005) (quoting *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981)).

Even when a petitioner properly exhausts a claim, a federal court may not grant habeas relief if the state court's decision rests on a violation of a state procedural rule.  *Johnson v. Pinchak*, 392 F.3d 551, 556 (3d. Cir. 2004).  This procedural bar applies only when the state rule is "independent of the federal question [presented] and adequate to support the judgment."  *Leyva*, 504 F.3d at 365-66 (citing *Nara v. Frank*, 488 F.3d 187, 196, 199 (3d Cir. 2007); *see also Gray v. Netherland*, 518 U.S. 152 (1996), and *Coleman v. Thompson*, 501 U.S. 722 (1991)).  If a federal court determines that a claim has been defaulted, it may excuse the default only upon a showing of "cause and prejudice" or a "fundamental miscarriage of justice."  *Leyva*, 504 F.3d at 366 (citing *Lines v. Larkins*, 208 F.3d 153, 166 (3d Cir. 2000)).

To the extent that a petitioner's constitutional claims are unexhausted and/or procedurally defaulted, a court can nevertheless deny them on the merits under 28 U.S.C. § 2254(b)(2).  *See Taylor v. Horn*, 504 F.3d 416, 427 (3d Cir. 2007) ("Here, because we will deny all of [petitioner's] claims on the merits, we need not address exhaustion"); *Bronshtein v. Horn*, 404 F.3d 700, 728 (3d Cir. 2005) (considering procedurally defaulted claim, and stating that "[under 28 U.S.C. § 2254(b)(2), we may reject claims on the merits even though they were not properly exhausted, and we take that approach here").

# IV.    ANALYSIS

The instant Petition raises eight grounds for relief.  For the reasons explained in this section, the Court finds that Petitioner's claims do not warrant federal habeas relief.

### A.    Trial Court Errors

#### 1.    Trial Court's Erroneous Admission of Prejudicial Evidence.

In ground one of his federal habeas petition, Petitioner asserts that the trial court's admission of prejudicial evidence against him was in violation of his right to due process and a fair trial.  (ECF No. 7 at 20-24).  More specifically, Petitioner asserts that the jury should not have heard evidence of his gang membership, the alleged threats against Tauheedah Carney, evidence of his incarceration pending trial, and his nickname "Killa Blak."  (*Id.*)

"[T]he Due Process Clause guarantees the fundamental elements of fairness in a criminal trial."  *Riggins v. Nevada*, 504 U.S. 127, 149 (1992).  In the field of criminal law, "the category of infractions that violate 'fundamental fairness' [is defined] very narrowly based on the recognition that, beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation."  *Medina v. California*, 505 U.S. 437, 443 (1992).  In order to satisfy due process, Petitioner's trial must have been fair, but it need not have been perfect. *United States v. Hasting*, 461 U.S. 499, 508-09 (1983) ("T]here can be no such thing as an error-free, perfect trial, and [] the Constitution does not guarantee such a trial.").

First, Petitioner asserts that the trial court erroneously permitted evidence of his membership in a street gang.  Petitioner submits that this evidence unfairly prejudiced him as the average juror in Essex County, New Jersey would have been well aware of the ongoing contention between Bloods and Crips because of the onslaught of violence and public safety concerns that these gang disputes caused.  (ECF No. 7 at 21-22).  The state responds that the trial

court correctly admitted evidence of Petitioner's gang membership as evidence of motive to shoot the decedent. (ECF No. 18 at 33-34).

Petitioner initially raised the instant claim on direct appeal. *See Goodman*, 1 A.3d at 776. On habeas review, the district court must review the last reasoned state court decision on each claim. *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991). The last reasoned state court decision with respect to this claim is the Appellate Division's opinion on direct appeal.

The Appellate Division denied the claim as follows:

> Goodman also contends that he was subjected to substantial undue prejudice because the evidence related to his gang membership amounted to evidence of "other crimes of wrongs" that, even if relevant, should have been excluded under N.J.R.E. 404(b). The State responds that the evidence was properly admitted for the purpose of showing Goodman's motive, which is an exception to the general exclusion of other-wrongs evidence under N.J.R.E. 404(b).
>
> . . .
>
> As a preliminary matter, we address the issue of whether the admission of evidence of gang membership under the circumstances of this case warrants analysis under the heightened standard of N.J.R.E. 404(b) as interpreted by *Cofield*.
>
> The Supreme Court has held that "[o]ther crimes evidence is considered highly prejudicial." *State v. Vallejo*, 189 N.J. 122, 133, 965 A.2d 1181 (2009) (citing *State v. Stevens*, 115 N.J. 289, 309, 558 A.2d 833 (1989)). While evidence of past crimes or wrongs may be relevant, such evidence cannot be introduced to show a defendant's propensity towards criminal conduct, *State v. Pitts*, 116 N.J. 580, 602, 562 A.2d 1320 (1989), or that he is a "bad person in general," *State v. Foglia*, 415 N.J. Super. 106, 123, 1 A.3d 703, 714 (App. Div. 2010) citing *Biunno*, Current N.J. Rules of Evidence, comment 7 on N.J.R.E. 404 (2010)). "The risk involved with such evidence is 'that it will distract a jury from an independent consideration of the evidence that bears directly on guilt itself.' " *Vallejo*, *supra*, 198 N.J. at 133, 965 A.2d 1181 (quoting *State v. G.S.*, 145 N.J. 460, 466, 678 a.2D 1092 (1996)).
>
> In *State v. Hernandez*, 334 N.J. Super, 264, 269-70, 758 A.2d 1139 (App. Div. 2000), *aff'd as modified*, 170 N.J. 106, 784 A.2d 1225

(2001), we explained the policy behind the exclusion of other-wrongs evidence as follows:

> This rule of evidence, successor to former *Evid. R.* 55, is based on the common-law recognition of both the inordinate prejudice to the defendant inherent in other-crimes evidence and, at the same time, the utility of that evidence to the prosecution when it is fairly probative of defendant's guilt of the crime charged and not merely of his propensity to commit crime. Because of the "widespread agreement that other-crimes evidence has a unique tendency to turn a jury against the defendant . . . ," *State v. Stevens*, 115 N.J. 289, 302 [558 A.2d 833] (1989), the compromise between the antagonistic interests that the Rule seeks to effect can be achieved only by the most delicate balancing. As *Stevens*, *supra*, at 303 [558 A.2d 833], explains, "[i]t is this inflammatory characteristic of other-crimes evidence that mandates a careful and pragmatic evaluation by trial courts, based on the specific context in which the evidence is offered, to determine whether the probative worth of the evidence outweighs its potential for undue prejudice." The tension between undue prejudice to the defendant and probative value to the State to prove a fact legitimately in issue induced the Supreme Court in *State v. Cofield*, 127 N.J. 328, 338 [605 A.2d 230] (1992), to articulate further the conditions of admissibility of other-crimes evidence . . .

Although evidence of membership in a street gang is not, as the State argues, evidence of actual criminal activity, it is at the very least strongly suggestive of such activity. As the district judge noted in one of the cases cited by the State, *Acosta*, *supra*, 110 F.Supp.2d at 931, "[t]he mere fact, or even allegation, of gang membership carries a strong taint of criminality." We recently held in *Foglia*, *supra*, 415 N.J. Super. at 122-23, 1 A.3d 703, that other-wrongs evidence need not involve actual criminal activity.

We conclude that N.J.R.E. 404(b) is applicable here because the average juror would likely conclude that a gang member has engaged in criminal activity. Such evidence has the potential to "taint" a defendant in much the same way as evidence of actual criminal conduct. Consequently, the evidence can only be used if

the more demanding provisions of N.J.R.E. 404(b), as interpreted in *Cofield*, are satisfied.

We now turn to the question of whether evidence of gang membership was properly admitted to prove motive in this case, applying the strictures of N.J.R.E. 404(b) and *Cofield*.

. . .

While acknowledging that our Supreme Court has not ruled specifically on the issue, the State points to *State v. Torres*, 183 N.J. 554, 569-71, 874 A.2d 1084 (2005), in which the Court outlined the case law in other jurisdictions that does allow such testimony. In *Torres*, the Court held that evidence about a defendant's gang involvement was admissible because it was "relevant to show the connection between defendant's actions as the leader of the gang and the actions of the other gang member who actually committed the murder." *Id.* at 573, 874 A.2d 1084.

In a footnote, however, the Court stated:

> [w]e observe that a number of state and federal courts have admitted gang expert testimony for the purpose of showing motive. Although we accept those cases as satisfying the test for reliability of gang expert testimony in the present case, we do not decide whether the expert testimony should be admissible to establish motive.
>
> [*Id.* at 571, 874 A.2d 1084.]

We do not read the Court's observation that it was not deciding the issue as indicative of a disposition not to allow such evidence in the future.

N.J.R.E. 404(b) generally precludes the admission of evidence pertaining to other crimes or wrongs, except to show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue or dispute." In *Cofield*, *supra*, 127 N.J. at 338, 605 A.2d 230, the Court set forth a four-factor test to govern the admissibility of such evidence for those purposes. The *Cofield* test requires that:

> 1. The evidence of the other crime must be admissible as relevant to a material issue;

2. It must be similar in kind and reasonably close in time to the offense charged;
3. The evidence of the other crime must be clear and convincing; and
4. The probative value of the evidence must not be outweighed by its apparent prejudice.

*State v. Williams*, 190 N.J. 114, 122, 919 A.2d 90 (2007) (citing *Cofield*, *supra*, 127 N.J. at 338, 605 A.2d 230).]

In *Williams*, however, the Court observed that the second Cofield factor "is not one that can be found in the language of Evidence Rule 404(b). *Cofield's* second factor, therefore, need not receive universal application in Rule 404(b) disputes." *Id.* at 131, 919 A.2d 90.

Our review of the record and the trial judge's decision convinces us that his decision to admit the evidence should be affirmed. We have already stated our reasons for concluding that the evidence was relative to the issue of motive, which satisfied the first *Cofield* factor. Goodman and Bryant were current gang members. Their meeting took place at a Crips corner, a place at which Goodman had previously complained about the visits of Bloods to drop off Carney. Consequently, we conclude that the substance of the second factor, if it is applicable, has been satisfied. The judge's determination that the evidence was clear and convincing was supported by the record, thereby satisfying the third factor.

Finally, we conclude that the fourth *Cofield* factor has been satisfied because the gang-related evidence explains Goodman's killing of Bryant despite their prior friendship. In addition to the testimony that Goodman and Bryant had been friends, there was testimony that, prior to his incarceration, Bryant had hung out and sold drugs at the corner without any protest from Goodman. The gang-related background explains why, after Bryant became a Blood, he was killed by Goodman when he returned to the corner of Ellis Avenue and Hopkins Place.

Consequently, the prejudice inherent in the revelation of Goodman's gang membership was outweighed by the probative value of the gang-related aspects of the relationship among Goodman, Bryant, and Carney in explaining why the events unfolded as they did. We know of no other evidence that could have been substituted for the gang-related testimony. *See State v. Jenkins*, 178 N.J. 347, 365, 840 A.2d 242 (2004) ("It is true that when motive or intent is at issue, we generally admit a wide range of evidence. Nevertheless, in

deciding whether prejudice outweighs probative value, a court must consider the availability of other evidence that can be used to prove the same point." (internal quotation marks and citations omitted)).

Once evidence is found to be admissible, "[t]he court must instruct the jury on the limited use of the evidence." *Cofield*, *supra*, 127 N.J. at 341, 605 A.2d 230. "[T]he court's instruction 'should be formulated carefully to explain precisely the permitted and prohibited purposes of the evidence, with sufficient reference to the factual context of the case to enable the jury to comprehend and appreciate the fine distinction to which it is required to adhere.' " Ibid. (quoting *State v. Stevens*, 115 N.J. 289, 304, 558 A.2d 833 (1989)).

The trial judge introduced the topic during the voir dire to ensure that prospective jurors who found such information prejudicial would be excluded, and then included appropriate limited instructions during his charges to the jury. Goodman does not challenge the sufficiency of the judge's charges in this regard.

*Goodman*, 1 A.3d 767 at **776-780.

At Petitioner's trial, the jury learned that Petitioner and decedent were members of rival gangs, the Crips and Bloods, respectively. Carney, the decedent's girlfriend and an eyewitness to the murder, testified about her personal knowledge of both men's gang affiliation. (ECF Nos. 19-8 at 72-161). Carney testified that Petitioner and decedent were friends until decedent joined the Bloods while he was incarcerated. (*Id.* at 77). Subsequently, Petitioner who was a member of the Crips, took umbrage with the decedent's newfound gang affiliation. (*Id.* at 78-79, 141-143). On the evening of his death, the decedent was standing on a street that was considered the Crip gang's territory. (*Id.* at 81, 134).

While the issue of a fact-finder hearing evidence of gang affiliation to establish motive has not been addressed by the United States Supreme Court, other courts in this circuit have considered the matter and found the evidence to be very probative of motive. *See, e.g.*, *Munoz v. Grace*, 2007

WL 2323134 at *13 (E.D. Pa. Aug. 10, 2007) ("[E]vidence of Petitioner's gang membership was highly probative on the issue of motive to commit [gang retaliation] murder.")

The state court's decision was not an unreasonable application of clearly established federal law. Here, Petitioner has not raised a valid constitutional violation, and the to the extent that he challenges the state court's application of state law, his claim fails. He has not established how the evidence of his gang membership, within the context of the case, violated his right to a fair trial. Therefore, this claim is denied.

Petitioner also claims that the trial court erroneously allowed evidence of his threats to Carney as well as evidence of his incarceration pending trial. (ECF No. 7 at 22). Although Petitioner raises these claims separately, because they are interrelated, the Court will address them simultaneously. The State responds that the evidence was elicited to establish Petitioner's consciousness of guilt and as such was appropriately admitted. (ECF No. 18 at 34).

Petitioner initially raised the instant claim on direct appeal. *See Goodman*, 1 A.3d at 776. The Appellate Division denied the claim as follows:

> We next turn to the admission of testimony concerning Goodman's letter to Jones and his statement to Carney at the Essex County Jail. Goodman contends the evidence should not have been admitted because the content of the letter and the words of the statement were too ambiguous, in addition to being prejudicial. He also contends that, in admitting the evidence of his statement to Carney, the trial judge improperly allowed the jury to learn that he was incarcerated.
>
> The State responds that the admission of the letter and the statement to Carney were proper because they were proof of Goodman's consciousness of guilt. It further argues that the fact of Goodman's incarceration was not unduly prejudicial because the judge took appropriate steps to limit undue prejudice.
>
> "Declarations subsequent to the commission of the crime which indicate consciousness of guilt, or are inconsistent with innocence or tend to establish intent are relevant and admissible." *State v. Rechtschaffer*, 70 N.J. 395, 413, 360 A.2d 362 (1976). In

*Rechtschaffer*, the Supreme Court upheld the admission of an investigator's testimony that the defendant "advised that if he found who the individual was that informed on him he would take his hunting knife and kill him." *Id.* at 401, 360 A.2d 362.

In *State v. Buhl*, 269 N.J. Super. 344, 364, 635 A.2d 562 (App. Div.), *certif. denied*, 135 N.J. 468, 640 A.2d 850 (1994), we upheld the admission of a letter from the defendant to another inmate "requesting him to kill the victim in order to prevent her from testifying."

> Our courts have long held that evidence of threats made by a defendant to induce a witness not to testify is admissible because it illuminates the declarant's consciousness of guilt. *See*, *e.g.*, *State v. Johnson*, 216 N.J. Super. 588, 611 [524 A.2d 826] (App. Div. 1987) (no error by the prosecutor in attempting to establish that the witness who was intimidated by defendant while both were incarcerated); *State v. Hill*, 47 N.J. 490, 500 [221 A.2d 725] (1966) (testimony that after trial began defendant accosted witness and threatened to kill him if witness took stand was admissible); *State v. Lassiter*, 197 N.J. Super. 2, 8 [484 A.2d 13] (App. Div. 1984) (witness allowed to testify that he had been shot three days before defendant's case was scheduled for trial); *State v. Plowden*, 126 N.J. Super. 228, 231 [313 A.2d 802] (App. Div.) (testimony that after shooting, defendant said he would kill anyone who identified him), *certif. denied*, 64 N.J. 504 [317 A.2d 717] (1974). *See also State v. Rivera*, 232 N.J. Super. 165, 174 [556 A.2d 1227] (App. Div.) (defendant's attempt to marry girlfriend admissible as evidence of consciousness of guilt), *certif. denied*, 117 N.J. 169 [564 A.2d 885] (1989).

[*Id.* at 364-65, 635 A.2d 562.]

The admission of the evidence in *Buhl* was premised on application of Evid. R. 55, which was the predecessor of N.J.R.E. 404(b). However, *Cofield* is not mentioned in the *Buhl* opinion. Although the trial judge relied on *Cofield* in admitting the gang evidence, he did not cite the case with respect to the consciousness-of-guilt evidence at issue. Goodman does not argue that he erred in failing to do so.

. . .

The evidence at issue, the letter and the statement, was clearly relevant to demonstrate consciousness of guilt. To the extent it is applicable, the essence of the second *Cofield* factor is satisfied because the actions involved were contemporaneous and directly related to Goodman's prosecution for the offenses being tried.

We conclude that the evidence also satisfied the third factor, because there was sufficient proof that Goodman wrote the letter and that he spoke to Carney at the jail. A fair reading of the letter to Jones, which had portions of Carney's statement to the police attached to it, clearly supports an inference that Goodman was seeking in some manner to influence Carney's availability as a witness. It may have been that Goodman wanted Jones to "reach out to those mean streets" to silence Carney in some way or it may be that, knowing that Jones was a Blood and had a relationship with Carney's best friend, he simply wanted word to get back to Carney that he was trying to do something to her. As to the incident at the jail, if the jurors believed Carney's testimony about the nature of Goodman's statement, they could conclude that it was indicative of consciousness of guilt, even if it had not been intended as an actual threat.

Whether Goodman made the statement attributed to him by Carney and whether the letter and statement should be interpreted by the jury in the manner urged by the State was a matter for the jury. In *Rechtschaffer*, *supra*, 70 N.J. at 401, 360 A.2d 362, the Supreme Court held:

> Although the remarks [that he would kill the informer] may also be interpreted as having expressed dismay at being unjustifiably incarcerated, they are consonant with an inference of an admission of guilt. It was properly the jury's function to determine the appropriate inference and the weight to be given to it.

Finally, we determine that the trial judge correctly determined that the probative value of the evidence outweighed the apparent prejudice. The judge ordered redaction of the letter to eliminate certain unnecessary inflammatory matter and gave appropriate limiting instructions.

It would not, as a practical matter, have been possible to present the consciousness-of-guilt evidence, especially Goodman's statement

> to Carney, without allowing the jury to know that Goodman was in
> pre-trial detention. We have held that statements demonstrating
> consciousness of guilt are admissible in circumstances where the
> defendant was incarcerated at the time those statements were made,
> although the issue was not specifically discussed. *Buhl, supra*, 269
> N.J. Super. at 364-65, 635 A.2d 562; *State v. Johnson*, 216 N.J.
> Super. 588, 611, 524 A.2d 826 (App. Div.), *certif. denied*, 107 N.J.
> 647, 527 A.2d 467 (1987). The trial judge gave an appropriate
> limiting instruction. We see no error or abuse of discretion with
> respect to the judge's decision on the issue.

*See Goodman*, 1 A.3d at 780-782.

Here, the record reflects that both Carney and Sergeant Ferrante testified about Petitioner's intimidation tactics through a face-to-face conversation with Carney as well as through a letter he wrote to his cousin asking for assistance in suppressing Carney's cooperation with law enforcement. (ECF Nos. 19-8 at 113-15, 19-12 at 32-37). In light of this testimony, the trial judge inquired of the jury panel about the possibility of bias because of Petitioner's detention. (ECF No. 19-8 at 67-68).

The state court's decision was not an unreasonable application of clearly established federal law. Petitioner's claim challenges an evidentiary ruling that was supported by the facts before the Court. Petitioner's efforts to intimidate a key prosecution witness both by approaching her in the bullpen at the county jail as well as in the letter to his cousin, if believed as such by the jury were properly introduced as evidence of consciousness of guilt. *See United States v. Gatto*, 995 F.2d 449 at 454-55 (3d Cir. 1993) (held that evidence of defendants' associates intimidating behavior towards a government witness before and during trial was admissible to show consciousness of guilt). But there was a sufficient evidential basis to let the jury consider the information. As for the claim challenging the admission of evidence of his pre-trial detention, the state court noted in the excerpt of the opinion, quoted *supra*, any evidence of Petitioner's pre-trial detention was only provided to give context to the conversation between Petitioner and Carney

and also to explain how the letter to his cousin was obtained by law enforcement. Therefore, Petitioner's claim is denied.

Petitioner next claims that the jury heard prejudicial evidence when a state witness referred to him by the name "Killa Blak." (ECF No. 7 at 23-24). Petitioner argues that this was highly prejudicial particularly because he was on trial for murder. (*Id.* at 24). The State responds that the reference to the nickname was inadvertent and not only did the trial court inquire as to whether the jury was influenced by this testimony but it also provided a curative instruction to the jury. (ECF No. 18- at 35).

At Petitioner's trial, a prosecution witness, Angela Smith, testified as follows:

> Q Miss Smith, do you know whether or not the defendant goes by another name?
> A Yes
> Q What?
> A Killa Black.
> MR. HAGGERTY: Judge, I'm going - - may I be heard at side bar?
> THE COURT: Yes.
>
> (Following takes place at side bar)
>
> THE COURT: Didn't we - -
> MS. WRIGHT: Judge, we had no idea she was gonna say that.
> THE COURT: Well, Ichey moely (ph) - -
> MS. WRIGHT: Judge, she's never - - she's only ever said Blak. She has never used that name with us, sir, never.
> THE COURT: All right.
> MS. WRIGHT; She's never said that.
> THE COURT: I'll let the jury go into the jury room and we'll do it all on the record. I'm gonna ask Miss what's-her-face, whatever her name is - -
> MS. SIMONETTI: Smith.
> THE COURT: Miss Smith could be brought back and I'll hear what you have to say.
>
> . . .
>
> THE COURT: All right. Just by way of quick background before I hear what Mr. Haggerty has to say, one of the things that I would

allow in is the sign off salutation: Ya lil cousin forever - - and I was gonna allow in the word Blak: not the word Killa Blak.

We all agreed that we'd not allow the jury to see on that letter the word killa, KILLA, Blak, because of the possibility it could be misconstrued. And now we have a witness who was aked: Do you know the defendant as any other name? And: I know him as Killa Blak, she said:

Mr. Haggerty has now objected and umm the Prosecutor indicated at side bar that she had no indication that the defendant - - that the witness was ever gonna use the words Killa Blak. But let me have Mr. Haggerty put his position fully and completely on the record.

MR. HAGGERTY:  When first asked: What do you know the defendant as? The response was: KB. That, apparently, wasn't sufficient. I did not object because I did not want to highlight it, KB could only mean Killa Blak. The prosecutor then asked: What other name do you know him by? The response was: Killa Blak.

This jury now knows this man's in custody. He's charged with murder. He's a member of a gang. He killed another gang member because - - over gang stuff. That he's threatened a witness. You have no choice but to grant me a mistrial and on the street, he's known as Killa Blak. How can this jury make a fair determination?

. . .

THE COURT:  I want the record to note that I have here S-40 for identification, which is the statement by Angela Smith. Nowhere in this statement does not refer to the defendant as Killa Blak. She refers to the defendant as Blak. And during her initial questioning, she indicated that she didn't know him by the name Quran Goodman, but knew him as KB. And then said that he was Killa Blak.

I accept the representation by the State that there is no prior indication that they had umm that she would utilize the word Killa Blak. The only possible implication was when he said KB. Now, I must admit when I heard KB, the first thing that came to my mind was Killa Blak, most respectfully. But it could have also been, I guess, Quran with K, being Quran Blak or something but - -

MR. HAGGERTY:  Quran begins with a Q - -

28

THE COURT: I understand that, Mr. Haggerty, and I thank you for the spelling lesson. But I guess that was a possibility too.

But the bottom line here is that there is no evidence before me that would suggest in any way, shape, manner or form that the State intentionally brought out the words Killa Blak, and I could tell just by looking at counsel when she said it that the Prosecutors were as surprised as anybody could have been in the courtroom today.

. . .

THE COURT: Okay.

I've considered the arguments of counsel and, Mr. Haggerty, I don't want you to fall over but I am not declaring a mistrial in this case. Evidence with respect to the gang involvement, in my view and that's right or wrong and maybe some other court will review that, was properly admitted in this case on the issue of motive. It wasn't just evidence that it was a Blood versus a Crip; there was Blood versus Crip of two people that knew each other and that the defendant expressed anger and dismay over the fact that the victim was a member of another gang.

Number two, I allowed evidence in of the threat, whether or not the threat was made and whether or not it is, in fact, a threat and whether that gives rise to consciousness of guilt is something for the jury to determine. I have already given limiting instructions with regard to that. So I think up to this point, notwithstanding how you feel about it and I respect it, of course, I don't think that we have a muddy or murky case. It's a difficult case, indeed, but I don't think that it's muddy or murky. And I think that I can cure this by giving a cautionary instruction to the jury.

Having made that ruling, I now invite you, Mr. Haggerty, if - - what do you think I ought to do?

Now that I said I'm not giving you a mistrial in connection with this case, I'm gonna give a curative instruction. Is there any language that you can suggest to me that you think that I ought to give now that you that you're stuck with my ruling?

(ECF No. 19-9 at 68, 69-70, 72-73, 88– 89).

The Court subsequently gave the following instruction to the jury:

I want to now give you an instruction. I am dis - - I am striking the testimony of Ms. Smith with regard to an alleged nickname of Quran Goodman. And I want you to disregard the testimony of Miss Smith with regard to any alleged nickname of Quran Goodman, other than Blak. And I tell you right now that no nickname is evidence of guilt whatsoever.

The use of a nickname, or any other kind of name, cannot and should not be considered by for any purpose whatsoever, especially if - - especially to show any predisposition on the part of defendant to - - to commit a crime or to otherwise perform any bad act whatsoever. You must disregard that testimony with respect to any alleged nickname other than Blak. It is not evidence of anything and I am instructing you to disregard it. And in particular, and not without limitation, you are not to utilize any of that testimony whatsoever in any of your deliberations. It cannot be used by you.

Now, I understand that it's hard for somebody to say: Don't think of a pink elephant. And what I'm asking you to do, therefore, is while you might remember the testimony, I ask you to put it in a box. Put lines around it and you are not to utilize it for any purpose whatsoever in your disposition - - in your decision in this case.

Mr. Goodman is presumed to be innocent and that presumption stays with him until the State has proven guilty beyond a reasonable doubt, if that is the conclusion that you come to at the end of this case. You cannot utilize this testimony in any way, shape, manner or form. If any of you feel that you're unable to abide by this instruction that I have now given to you, to disregard that testimony that I have now stricken, I need to know now. Is there anybody who feels that they can't abide by it? Anybody here feels that they would be unable to reach a fair and impartial verdict as consequence of hearing testimony that I've stricken and now have given you an instruction with respect to? All right.

Let the record reflect that none of the jurors has responded affirmatively to that. And I'd like now for Miss Smith to be brought back into the courtroom and we will continue with our trial.

(ECF No. 19-9 at 95– 96).

Petitioner initially raised the instant claim on direct appeal. *See Goodman*, 1 A.3d at 776.

The Appellate Division denied the claim as follows:

> Although the State offers harmless interpretations of the name
> "Killa," there can be little doubt that the name was prejudicial and
> should not have been used. The trial judge took great pains to
> determine whether the use of the name was inadvertent or
> intentional. Having satisfied himself that the testimony was
> inadvertent and not invited by the prosecutor, he questioned the jury
> to determine the extent of any prejudice and gave a strong curative
> instruction.
>
> Based upon our review of the record as a whole, we conclude that
> the trial judge acted appropriately and that he did not abuse his
> discretion in deciding to deny the application for mistrial.

*See Goodman*, 1 A.3d at 782.

Here, the record reflects that the trial court took great pains to avoid any information related to Petitioner's entire nickname, "Killa Blak," from coming into evidence. Moreover, once Smith testified about Petitioner's nickname, the trial court not only crafted a curative instruction suitable to the parties but also asked the jury to determine whether it could follow the curative instruction. Further, the Appellate Division considered the "inadvertent" nature of the testimony when rejecting Petitioner's claim. Petitioner has not demonstrated how the state court's decision was contrary to clearly established federal law. Therefore, this claim is denied.

B.      Ineffective Assistance of Counsel Claims

Next, the Court will address Petitioner's ineffective assistance of counsel claims. Petitioner was represented at trial by Mr. John J. Haggerty, III, Esq.

The Supreme Court set forth the standard by which courts must evaluate claims of ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668 (1984). First, the defendant must show that counsel's performance was deficient. This requirement involves demonstrating that counsel made errors so serious that he was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Id.* at 687. Second, the defendant must show that he was

prejudiced by the deficient performance. *Id.* This requires showing that counsel's errors deprived the defendant of a fair trial. *Id.*

Counsel's performance is deficient if his representation falls "below an objective standard of reasonableness" or outside of the "wide range of professionally competent assistance." *Id.* at 690. In examining the question of deficiency, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. In addition, judges must consider the facts of the case at the time of counsel's conduct, and must make every effort to escape what the *Strickland* court referred to as the "distorting effects of hindsight." *Id.* The petitioner bears the burden of showing that counsel's challenged action was not sound strategy. *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986). Furthermore, a defendant must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Id.* at 694.

When assessing an ineffective assistance of counsel claim in the federal habeas context, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable," which "is different from asking whether defense counsel's performance fell below *Strickland's* standard." *Grant v. Lockett*, 709 F.3d 224, 232 (3d Cir. 2013) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)). "A state court must be granted a deference and latitude that are not in operation when the case involves [direct] review under the *Strickland* standard itself." *Id.* Federal habeas review of ineffective assistance of counsel claims is thus "doubly deferential." *Id.* (quoting *Cullen v. Pinholster*, 131 S.Ct. at 1403). In other words, federal courts must "take a highly deferential look at counsel's performance" under *Strickland*, "through the deferential lens of § 2254(d)." *Id.* (internal quotation marks and citations omitted). "With respect to the sequence of the two prongs, the *Strickland* Court held that 'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of

the alleged deficiencies . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.'" *Rainey v. Varner*, 603 F.3d 189, 201 (3d. Cir. 2010) (quoting *Strickland*, 466 U.S. at 697)).

In Petitioner's grounds two, three and six, he claims that counsel was ineffective for failing to adequately challenge and address issues related to the gang expert testimony. (ECF No. 7 at 25-26, 28-29). Because the claims are interrelated, the Court will assess them simultaneously. In ground two, Petitioner submits that counsel was ineffective because he "failed to challenge the trial court's finding that the expert was qualified to give opinion testimony regarding gangs." (*Id.* at 25-26). In ground three, Petitioner submits that counsel was ineffective because he "objected to expert testimony then waived said objection." (*Id.* at 26). Finally, in ground six Petitioner submits that counsel failed to "retain an expert to rebut the state's gang expert." (*Id.* at 28-29). Petitioner submits that Lieutenant Earl Graves of the Essex County Prosecutor's Office was not qualified to testify as a gang expert. Petitioner further argues that Graves' testimony was critical to establish the state's theory that gang rivalry motivated the murder. (ECF No. 7 at 25-26). The state responds that the state court appropriately denied Petitioner's claims because he could not demonstrate that counsel was ineffective for how he handled the issues related to the gang expert witness. (ECF No. 18 at 36, 39, 41).

The last reasoned state court decision with respect to this claim is the Appellate Division's review of the PCR Court's decision. The Appellate Division denied the claim as follows:

> We address Goodman's arguments relating to the failure to object to the State's gang expert. We find this argument lacks merit as the witness clearly was qualified to testify as an expert at to his knowledge of gangs and their culture. N.J.R.E. 702. Graves had worked in the Prosecutor's office for thirteen years. As the supervisor of the gang unit, he had worked on gang investigations. He had previously been qualified as an expert in court and given testimony. Graves had both training and knowledge as to gang

culture and behavior, hence any objection would have been futile. Goodman has failed to make a prima facie showing of either prong of the *Strickland* test necessary for him to be entitled to an evidentiary hearing.

In a related argument, Goodman states that when his attorney withdrew his objection to certain testimony of Graves, it was deficient conduct. We disagree. Graves intended to use the term "arch rivals" at trial to describe the relationship between the Crips and the Bloods. This term had not been used in his report. After defense counsel objected to the term and the court sustained the objection, counsel then asked to speak to the expert to get a precise understanding of how Graves intended to use the term. When he obtained a satisfactory definition, counsel then withdrew his objection. He agreed that "arch rivals" was used to describe two groups that fight with one another when they get together, and as counsel summarized it: "they act like cats and dogs with each other, fight like cats and dogs, and that whenever they get together, there's generally some kind of beef." Goodman provides no support for his claim that this conduct was deficient nor that he suffered prejudice from this testimony.

As the PCR judge concluded: "Considering the facts in the light most favorable to [defendant], he has not proven a reasonable likelihood of success of his ineffective assistance of counsel claim on the basis of defense counsel's alleged failure to object to certain expert testimony." As there was no prima facie case of ineffective assistance of counsel, Goodman was not entitled to an evidentiary hearing.

*Goodman*, 2015 WL 9947700 at *3-4.

As for the issue related to counsel's purported failure to present a gang expert, the Appellate Division summarily denied this claim pursuant to New Jersey Rule 2:11-3(e)(2).[2] *See id.* at *4.

"[F]ederal habeas law employs a 'look through' presumption." *Wilson v. Sellers*, 138 S. Ct. 1188, 1194 (2018). In cases in which the last reasoned decision is unexplained, the federal court should

---

[2] This rule authorizes an affirmance when in an appeal of a criminal, quasi-criminal or juvenile matter, the Appellate Division determines that some or all of the arguments made are without sufficient merit to warrant discussion in a written opinion.

"'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale." *Id.* at 1192.

The PCR Court, which provided the last reasoned decision, denied the claims as follows:

> Petitioner is correct that defense counsel did not retain an expert to rebut the State's gang expert at trial. However, Petitioner's contention that defense counsel inadequately prepared for trial by failing to obtain this rebutting expert is merely speculative. Although it is not entirely clear from Petitioner's brief, Petitioner appears to claim that because the State's expert testimony "put teeth on the State's claim that the killing was gang-related," defense counsel's failure to offer rebutting testimony was deficient. *Id.* Petitioner then broadly claims that this alleged deficiency "terribly" prejudiced him. *Id.* He does not specify the prejudice caused.
>
> These claims fail to prove through specific factual allegations that defense counsel's performance was deficient, i.e., that his attorney "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the petitioner by the Sixth Amendment." *Strickland*, *supra*, at 687. As the State notes in its brief on pages 7-8, defense counsel's witness rebuttal decision was strategic. This soundness of this strategy is evident from the record. Defense counsel stated on the record that he considered retaining a gang expert in rebuttal: "Just as an aside, we're rapidly getting to the point where I may have to have an expert sit in the back of the courtroom and listen to the expert and put somebody on, Judge." T114:16-19 (Aug. 22, 2006). However, defense counsel ultimately chose not to call a rebuttal witness and instead came to an agreement with the State and the court as to the scope of the State's expert testimony. T-11-12:10-2 (Sept. 1, 2006). Defense counsel then used this information in his opening statement, his closing statement, and in his case overall to underpin his own trial strategy. T33-34 (Aug. 29, 2006); T37:17-21; T45-47:18-6; T49-52:22-18; T54-55:9-24;T66-67:25-13 (Sept. 7, 2006). Thus, it is apparent from the record that defense counsel decided to permit the State expert's gang testimony in order to support his defense strategy and aid his client.
>
> . . .
>
> Even had defense counsel pursued its own gang expert, Petitioner asserts no proof of an existing, qualified expert who could have rebutted Lieutenant Graves's gang rivalry testimony. Nor does Petitioner adduce any evidence that a rebutting gang expert would have testified differently with respect to the gang rivalry issue in this

case. Thus, Petitioner fails to demonstrate that he was prejudiced- that the result would have been different- had defense counsel obtained a rebutting gang expert. *Strickland*, *supra*, at 466. Prejudice must be proved; it cannot be presumed. *Id.* at 692-93.

(ECF No. 18-20 at 41-43).

To summarize Petitioner's argument, he submits that the state's gang expert's testimony, without any rebuttal gang expert testimony of his own, played an unduly significant role in the jury's understanding of the parties' relationships because Bloods and Crips also share close familial and friendly bonds. His claim totally flies in the face of other evidence such as Carney's testimony that the tension between the decedent and Petitioner appeared to stem from their respective gang affiliations, chiefly the decedent's newly cemented status as a Blood. Even if a gang expert was retained by the defense, Petitioner has not demonstrated how that expert's testimony would have weakened the testimony that rival gang loyalties was the catalyst for the tension between Petitioner and the decedent. Consequently, Petitioner has failed to establish how he was prejudiced by counsel's failure to address the matter of gang expert testimony by presenting an expert of his own. The state court's denial of Petitioner's aforementioned ineffective assistance claims was not an unreasonable application of clearly established federal law. Therefore, Petitioner's claim two, three and six are denied.

Petitioner next claims that counsel was ineffective for failing to object to the court's admission of testimony about his pre-trial detention when it admitted evidence of the threats he made to Carney while they were both detained. (ECF No. 7 at 27-28). The state responds that the PCR Court correctly deemed this claim procedurally barred pursuant to New Jersey Rule 3:22-5, because it was previously adjudicated on direct appeal. (ECF No. 18 at 43-44, 54-55). However, this Court notes that Petitioner's claim before the PCR Court related to appellate counsel's failure to raise the claim on appeal. (ECF Nos. 18-12 at 15, 18-20 at 16). The Appellate Division

subsequently summarily affirmed the PCR Court's decision, citing to Rule 2:11-3(e)(2). *Goodman*, 2015 WL 9947700 at *2, 4.

Therefore, this claim appears to be unexhausted. Nonetheless, this Court will deny the claim on the merits. *See Granberry v. Greer*, 481 U.S. 129, 131, 135 (1987) (noting that the exhaustion requirement is not a jurisdictional requirement to the exercise of habeas corpus jurisdiction over the merits of a state prisoner's claims and a district court may deny a claim on its merits despite non-exhaustion "if it is perfectly clear that the applicant does not raise even a colorable federal claim."). The record reflects that once the issue of Petitioner's recent threat to Carney was brought before the trial court, defense counsel raised an objection to the threat and the fact that it would introduce evidence of his client's incarceration. (ECF No. 19-8 at 26-27, 47). The trial court considered the parties' arguments and eventually decided to allow the information into evidence, citing the judge's concern about evidence of the threat being taken out of context if the jury was not aware of the parties' respective locations when the threats were made. (*Id.* at 38-45). As the state points out, defense counsel did raise his objection before the trial court. Petitioner has not made a showing of ineffective assistance or even that his counsel failed to object to this issue. Therefore, this claim is denied.

Petitioner next claims that counsel was ineffective for failing to raise a discovery violation under *Brady v. Maryland*, 373 U.S. 83 (1963). (ECF No. 7 at 28). Petitioner submits that trial counsel could not "investigate and prepare a defense" because the prosecution failed to "provide the defense counsel with discovery regarding pending charges and potential favorable treatment for the primary witness against Petitioner, Carney." (*Id.*) The state responds that the PCR Court correctly deemed this claim procedurally barred pursuant to New Jersey Rule 3:22-4, because it could have been raised on direct appeal. (ECF No. 18 at 44-45, 55).

The PCR Court deemed this claim procedurally defaulted pursuant to New Jersey Rule 3:22-4 because the claim could have been raised on direct appeal. (ECF No. 18-20 at 35). The Appellate Division subsequently summarily affirmed the PCR Court's decision, citing to Rule 2:11-3(e)(2). *Goodman*, 2015 WL 9947700 at *2, 4. Yet, to the extent that a petitioner's constitutional claims are unexhausted and/or procedurally defaulted, a reviewing court can nevertheless deny them on the merits under 28 U.S.C. § 2254(b)(2). *See Taylor v. Horn*, 504 F.3d 416, 427 (3d Cir. 2007)

Shortly before trial commenced, defense counsel raised a discovery issue before the trial court-

> MR. HAGGERTY: There's an outstanding discovery issue relative to the complaints pending against Tauheedah Carney and Angela Smith. Prosecutor indicates she'll get those to me before she hits the stand.
>
> MS. WRIGHT: I don't think it is a discovery issue but the State is more than willing to provide to counsel for his use during cross-examination of Miss Carney and Miss Smith or Miss Newton, depending which complaint we're talking about, copies of the complaints which presently held them in custody. Those complaints are on their way to me now via fax from the Gang Unit.
>
> THE COURT: So I'm alerted to the fact that you're both cooperating, that's terrific. Does somebody have a cell phone on?
>
> COURT OFFICER; It was turned off, Judge.
>
> THE COURT: Okay, great. Are we ready to bring in our jury now?

(ECF No. 19-7 at 13-14).

Allegations involving *Brady*, 373 U.S. 83 are analyzed as a form of prosecutorial misconduct, which has certain requisite elements. *See Banks v. Dretke*, 540 U.S. 668, 671 (2004). In that regard, Petitioner "must show that: (1) the government withheld evidence, either willfully or inadvertently; (2) the evidence was favorable, either because it was exculpatory or of

impeachment value; and (3) the withheld evidence was material." *Lambert v. Blackwell*, 387 F.3d 210, 252 (3d Cir. 2004) (citations omitted). "[E]vidence is 'material' within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone v. Bell*, 556 U.S. 449, 469-70 (2009). "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

Petitioner's claim that the discovery contained "potential favorable treatment for the primary witness against Petitioner" is purely speculative. While the record reflects that the defense was awaiting additional witness-impeaching discovery at the start of trial, it appears that the prosecution was continuing to meet its ongoing discovery obligations, as evidenced by the colloquy with the trial court. Consequently, Petitioner has not established how he was prejudiced by his counsel's failure to raise this purported *Brady* issue because Petitioer has not established that any *Brady* material was withheld. Therefore, this claim is denied.

Petitioner argues that the evidence supported a charge of the lesser-included offense of aggravated manslaughter and that his counsel's failure to challenge the trial court's decision not to give the charge was ineffective. (ECF No. 7 at 29-30). Petitioner concedes that his trial counsel requested the lesser included offense, despite the trial court's ultimate refusal. However, in his federal habeas petition he submits "failure of trial counsel to challenge this ruling constituted ineffective assistance of counsel." (*Id.* at 30). The State construes Petitioner's claim to be a claim of ineffective assistance of appellate counsel for failure to raise the claim on direct appeal, and

they argue that the record belies this claim because it was raised on appeal, albeit unsuccessfully. (ECF No. 18 at 50).

On Petitioner's direct appeal, the Appellate Division denied the claim as follows:

> Finally, we briefly address Goodman's argument that the trial judge improperly denied defense counsel's request to instruct the jury on the lesser-included offense of aggravated manslaughter. We find his arguments to be without merit and not warranting an extended discussion in a written opinion. R. 2:11-3(e)(2). We add only the following.
>
> When a defendant requests the trial judge to charge a lesser-included offense, "the court is obligated to examine the record and determine whether a rational basis exists for the jury to acquit the defendant of the charged offense and convict him of the lesser offense." *State v. Harris*, 357 N.J. Super. 532, 539, 816 A.2d 171 (App. Div. 2003). See also N.J.S.A. 2C:1-8(e); *State v. Denofa*, 187 N.J. 24, 42, 898 A.2d 523 (2006) ("[C]ourts are required to instruct the jury on lesser-included offenses only if counsel requests such a charge and there is a rational basis I the record for doing so or, in the absence of a request, if the record clearly indicates a charge is warranted.').
>
> When requesting aggravated manslaughter as a lesser-included offense of murder, the evidence must allow "a finding that the defendant was aware of and disregarded a probability but not a practical certainty that his conduct would cause death." *State v. Gaines*, 377 N.J. Super. 612, 623, 873 A.2d 688 (App. Div.), *certif. denied*, 185 N.J. 264, 883 A.2d 1061 (2005). Having reviewed the record, we conclude that there was no rational basis for a charge of aggravated manslaughter, largely for the same reasons articulated by Judge Kennedy. The testimony was that Goodman shot Bryant as many as seven times at relatively close range. There was simply no basis for the jury to find that Goodman "was aware of and disregarded a probability but not a practical certainty that his conduct would cause death."

*Goodman*, 1 A.3d 767, 783 (2010).

To the extent that Petitioner now asserts an ineffective assistance of appellate counsel claim for not raising this claim on appeal, this claim is undercut by the record as appellate counsel did raise this claim. Accordingly, this claim will be denied.

Lastly, Petitioner claims that his counsel's cumulative errors constituted a violation of his right to effective assistance. (ECF No. 7 at 30). Respondents reply that the state court aptly denied this claim because Petitioner has not demonstrated how his counsel's performance was ineffective. (ECF No. 18 at 51-52).

The PCR Court denied this claim as follows:

> The court's dismissal of this claim is self-explanatory given that each of Petitioner's individual ineffective assistance of counsel claims are dismissed.
>
> Petitioner also inserts a claim in this section of his brief that defense counsel failed to pursue "any independent areas of investigation" in developing his defense strategy. (citation omitted) Petitioner then asserts that defense counsel "failed to investigate the matter," although Petitioner does not explain how to do so. Without providing the Court with any reasons or proof as to how defense counsel failed to investigate the matter, Petitioner fails to make out a prima facie claim that counsel was deficient. Regarding the prejudice prong of *Strickland*, Petitioner states that "there is a reasonable probability that, but for counsel's failure to offer evidence in support of the defense theory, the result of the proceedings would have been different." (citation omitted) Yet, without any further elaboration as to how the proceedings would have been different, Petitioner fails to make out a claim of prejudice. Prejudice must be proved; it cannot be presumed. (citation omitted). Therefore, Petitioner has failed to make out a prima facie case of ineffective assistance of counsel, and no evidentiary hearing can be granted on this claim.

(ECF No. 18-20 at 44-45).

Having already considered Petitioner's individual ineffective assistance claims, this Court has determined that Petitioner has failed to make a showing of ineffective assistance of counsel. Therefore, Petitioner has not shown that the PCR trial court erred, and his alleged instances of ineffective assistance may not serve as a basis for his cumulative error ineffective assistance claim. While a federal court may conduct a review of cumulative ineffective assistance claims as standalone constitutional claims, Petitioner has not demonstrated that the individual

errors satisfy the *Strickland* standard. *See Collins v. Sec'y of Pa. Dep't of Corr.*, 742 F.3d 528, 542-43 (3d Cir. 2014). Accordingly, this claim is denied.

## VI.    CERTIFICATE OF APPEALABILITY

This Court must determine whether Petitioner is entitled to a certificate of appealability in this matter. *See* Third Circuit Local Appellate Rule 22.1. The Court will issue a certificate of appealability if the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Based on the discussion in this Opinion, Petitioner has not made a substantial showing of denial of a constitutional right, and this Court will not issue a certificate of appealability.

## V.    CONCLUSION

For the reasons discussed above, Petitioner's habeas petition is denied. An appropriate Order accompanies this Opinion.


Dated November 25, 2019                          s/ John Michael Vazquez
                                                 JOHN MICHAEL VAZQUEZ
                                                 United States District Judge